[Cite as *State v. Renode*, 2020-Ohio-5430.]

## COURT OF APPEALS OF OHIO

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109171 |
| v. | : | |
| JACQUE RENODE, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 25, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-617731-A

---

### *Appearances:*

Michael C. O'Malley Cuyahoga County Prosecuting Attorney, Maxwell Martin and Kevin Bringman, Assistant Prosecuting Attorneys, *for appellee.*

John F. Corrigan, *for appellant.*

PATRICIA ANN BLACKMON, P.J.:

{¶ 1} Defendant-appellant, Jacque Renode, appeals from his convictions for murder, felonious assault, aggravated menacing, and intimidation of a witness. He assigns the following errors for our review:

I. The trial court erred in denying [Renode] the right of confrontation.

II. The trial court erred in overruling [Renode's] motion for a mistrial.

III. [Renode's] convictions were not supported by legally sufficient evidence as required by state and federal due process.

IV. [Renode's] convictions were against the manifest weight of the evidence.

{¶ 2} Having reviewed the record and the pertinent law, we affirm.

{¶ 3} Renode was indicted for aggravated murder, murder, felonious assault, and aggravated menacing in connection with the death of 14-year-old J.D. Together with his girlfriend, Navi Sanders ("Sanders"), Renode was also indicted for attempted murder, felonious assault, discharge of a weapon near prohibited premises, improperly handling a firearm in a motor vehicle, and intimidation of crime witness A.B. in connection with a drive-by shooting that occurred four days after J.D.'s death.[1] The cases against Renode were consolidated and proceeded to a jury trial in September 2019.

{¶ 4} Jenna Davis ("Davis"), mother of J.D., testified that she met Sanders in about 2014. Over the course of their friendship, Sanders periodically stayed with Davis when Sanders did not have housing. By 2016, Davis, J.D., and Davis's younger son were living in a single family home on West 105th Street in Cleveland. Later

---

[1] A.B. testified during Sanders's trial. *See State v. Sanders*, 8th Dist. Cuyahoga No. 106744, 2018-Ohio-4603. However, prior to Renode's trial, A.B. was shot and killed in an unrelated incident.

that year, Davis's boyfriend of eight years, Damien Sellers ("Sellers") also moved into the home.

{¶ 5} Davis established that in November 2016, she learned that Sanders and Renode needed a place to stay after a fire in their apartment. Davis agreed to let them stay with her and they moved in a short time later. However, friction quickly developed between Sanders and J.D. after they argued over Davis's cell phone. Renode also fought with J.D. and accused him of looking at Sanders "inappropriately." Due to their ongoing issues with J.D., Davis told Sanders and Renode that they had to move out. At that point, Sanders and Davis had a physical altercation. Davis subsequently packed their belongings and left them on the porch where Renode's mother picked them up.

{¶ 6} On November 27, 2016, Renode and Sanders returned to Davis's home. According to Davis, they were beating on the door, pounding on windows, and Renode threatened that if Davis did not let him in, he would "com[e] back [to] kill all you guys." Davis's neighbor, Dena Simones ("Simones"), called the police, but Renode and Sanders fled before police arrived. Several days later, however, they returned. Sanders told Davis that they had secured housing, but it would not be available until Monday, December 5, 2016. Davis testified that her younger son persuaded her to let them in, and she agreed because it was for a short duration. Several days later, Simones's electricity was disconnected, and Davis invited her and her three boys to also stay at the West 105th Street house.

{¶ 7} On the afternoon of December 3, 2016, Davis, Sellers, and Simones left for several hours to buy groceries. During this time, Sanders and Renode were home with J.D., Davis's younger son, Simones's 14-year-old son A.B. A.B.'s girlfriend A.F., and Simones's two younger children. According to A.F., as the group sat together, Renode improvised a song, singing that he was "going to body this n----."

{¶ 8} By the time that Davis, Simones, and Sellers returned from shopping, J.D. was intoxicated. Davis stated that she was upset with Renode, and Sanders, and she sent J.D. to his room. J.D. remained in his room for the remainder of the night, and was lying on the floor of his room, watching television.

{¶ 9} The group remained in the house that evening. J.D. remained in his room on the floor, with Davis checking on him periodically and bringing him food. Simones's children were in another bedroom. The third bedroom was unoccupied and contained only dirty clothes and an uninflated air mattress. Simones and Davis's younger son were in the dining room, watching a movie. Davis and Sellers were sleeping on a sectional sofa, in the living room. Renode and Sanders were also in the living room, sharing a chair. Davis thought that Renode and Sanders would be more comfortable in a bed, so she told them that they could sleep on the bed in J.D.'s room.

{¶ 10} Davis testified that in the middle of the night, Sellers left to buy cigarettes at a nearby store. After that, she went upstairs to check on the children. Davis immediately observed that the door to J.D.'s room, which had been off of its

hinges was now placed in the doorway of J.D.'s room. Davis went inside and saw J.D. wrapped in a blanket and blood everywhere. Davis yelled for Simones to call the police then sent A.B. to the store to get Sellers. According to Davis, Renode subsequently ran into the house, up the steps, then ran from the scene. Sellers arrived a few minutes later and was still wearing the same white hooded sweatshirt that he was wearing earlier that night. Sellers was crying, distraught, and upset when he learned that J.D. was hurt, and he spoke with police on the scene and afterward.

{¶ 11} Sellers testified that he thought of J.D. as a son and denied all involvement in the murder. He testified that he could not sleep so he decided to walk to a nearby store for cigarettes. As he went upstairs to get his shoes, he saw Renode coming downstairs, and Renode said that he would join him. When they arrived at the store, Renode asked Sellers to get lighter fluid. The clerk passed the lighter fluid to them, and Renode put it in his pocket and passed Sellers a debit card. When the card was declined, Renode ran out of the store with the lighter fluid. Sellers chased after Renode and brought the lighter fluid back to the store.

{¶ 12} According to Simones, Renode was wearing basketball shorts when he returned from the store. He sat on the steps of the house, then abruptly said, "I gotta get the f--- outta here," and ran from the scene. Sanders also left before the police arrived.

{¶ 13} Paramedics determined that J.D. was dead at the scene. The police recovered a bloody knife from J.D.'s room along with clothing and other pieces of evidence during their initial investigation of the home.

{¶ 14} Deputy Medical Examiner Todd Barr, M.D. ("Dr. Barr") testified that J.D.'s death was a homicide that was the result of two separate events: compression asphyxiation that caused bleeding in his brain; and a deep stab wound to his neck.

{¶ 15} Following J.D.'s death, Davis, Sellers, and Davis's younger child stayed with Simones. A day or two later, Sellers, together with A.B. and A.F., went into Davis's house to get clothing and food. Sellers testified that he noticed a pair of blood-stained tan pants in a pile of dirty clothing in the unused bedroom. He asked A.B. for a stick or pencil to handle the pants and called the police to return to the home. The police retrieved the pants and also removed a pair of stained blue jeans that were located in the living room. According to Cleveland Police Detective Mark Peoples ("Det. Peoples"), when the police were on the scene immediately after the homicide, clothing was "all over the floor" of this bedroom and they took only a "cursory glance" at it.

{¶ 16} Curtiss Jones ("Jones"), Cuyahoga County Medical Examiner's Office trace evidence supervisor, testified that the blue jeans recovered from the house had staining that was negative for blood. The tan pants recovered from the house had multiple blood stains, including spatter stains, drip stains, saturation stains, and blood transfer stains. According to Jones, a spatter stain is created from the impact of force into liquid blood, where the impact causes a sort of splash of blood droplets

through the air that are projected into the general area of impact. A saturation stain occurs when blood accumulates and soaks into an item. A transfer stain occurs when a bloody object comes into contact with another object and deposits an imprint stain. A drip stain is a stain pattern, caused either from the injury or a bloody object that leaves a series of drops.

{¶ 17} According to DNA analyst Lisa Moore ("Moore") of the Cuyahoga County Regional Forensic Science Laboratory, DNA evidence of the knife recovered from the scene contained J.D.'s blood. The blade and handle contained such a tremendous amount of blood that J.D.'s DNA would have masked any other DNA contributor to this item of evidence. The blood on the tan pants located by Sellers in the unoccupied bedroom also contained J.D.'s blood. However, DNA recovered from the inner waistband had a mixture of DNA. Renode was determined to be the major contributor by a likelihood of one in 109 quintillion unrelated African-American individuals. Sanders was the minor contributor by a likelihood of one in 206 trillion unrelated African-American individuals. No evidence linked Sellers or A.B. to the tan pants.

{¶ 18} Approximately four days after J.D.'s death, while Davis, Sellers, and Davis's other child were still staying with Simones, and A.F. was visiting, Simones noticed a car stopped in front of her house. The car backed up then pulled forward. A.B. and A.F. headed outside, and Simones turned her attention inside the house. A few moments later, Simones heard multiple gunshots. A car parked in her driveway was struck by a bullet. According to Simones, as she looked back outside, she got a

"glimpse" of Renode and heard Sanders shout, "Go, go!" Simones immediately called the police. Simones admitted that during the initial portion of the 911 call she stated that she did not know who the assailant was, but three minutes into the call she told the dispatcher that the shooting was committed by the same individuals connected to J.D.'s murder.

{¶ 19} Over strenuous defense objection, Simones also testified to the statements and mental state of A.B. who died prior to trial. According to this testimony, A.B. was shaking and could hardly breathe, and stated that he observed Renode produce a gun from the back window and start shooting.

{¶ 20} A.F. testified that she was outside with A.B. when the shots were fired. She observed three people in the car and saw a silver gun. According to A.F., after the shots were fired, A.B. was scared and under an "adrenalin rush."

{¶ 21} Officer Justin Lawrence ("Officer Lawrence") of the Indianapolis Police Department testified that on May 23, 2017, he responded to a call regarding an argument between Renode and Sanders near a McDonald's in Indianapolis. Officer Lawrence spoke with them and determined their identities. As he learned that there was a warrant for Renode, Renode fled the scene. He was eventually captured by SWAT officers on a nearby rooftop, then extradited to Ohio.

{¶ 22} Renode was convicted of murder, felonious assault, aggravated menacing, and intimidation of a crime witness.[2] The trial court sentenced him to life imprisonment with parole eligibility after 21 years.

**Confrontation**

{¶ 23} In the first assigned error, Renode argues that the trial court deprived him of his constitutional right of confrontation when it permitted Simones to testify regarding a declaration from A.B. that Renode was the shooter in the December 8, 2016 drive-by shooting. Renode argues that A.B.'s statement does not constitute an admissible excited utterance because it was not contemporaneous, was not made under nervous excitement, and A.B. himself did "not have the opportunity to observe personally the matters [he] asserted[.]" Renode also notes that during Sanders's trial (and prior to A.B.'s death), the court determined that some of Simones's testimony regarding A.B.'s declarations were inadmissible hearsay.

{¶ 24} In *Crawford v. Washington*, 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment to the United States Constitution permits testimonial statements of witnesses absent from trial where the declarant is unavailable, only where the defendant has had a prior opportunity to cross-examine.

---

[2] On September 14, 2017, Sanders was convicted of felonious assault, discharging a firearm near a prohibited premises, improper handling of a firearm in a motor vehicle, and intimidation of a crime witness. This court affirmed. *Sanders*, 2018-Ohio-4603. An en banc panel also affirmed, concluding that an underlying criminal or delinquent act is not an essential element of intimidation of a witness. *See State v. Sanders*, 8th Dist. Cuyahoga No. 106744, 2019-Ohio-2566 (en banc).

Testimonial statements include statements "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52. *See also Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency." *Davis* at 823. *See also State v. Eicholtz*, 2d Dist. Clark No. 2012-CA-7, 2013-Ohio-302, ¶ 26.

{¶ 25} "Typically, 911 calls made to report an ongoing emergency that requires police assistance to resolve that emergency are not 'testimonial' in nature and therefore the Confrontation Clause does not apply." (Citations omitted.) *State v. McDaniel*, 2d Dist. Montgomery No. 24423, 2011-Ohio-6326, ¶ 24. Moreover, courts have "generally held that a 911 call made by a domestic assault victim is not testimonial in nature and that, where the excited utterance exception to the hearsay rule applies, the admission of such a statement does not violate the Sixth Amendment right to confrontation of witnesses." (Citations omitted.) *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624 at ¶ 13. *Accord State v. Kerr*, 2d Dist. Montgomery No. 26686, 2016-Ohio-965, ¶ 22.

{¶ 26} The court in *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 23, the court recognized that "[i]n *Davis*, the court held that a 911 telephone call made to seek protection from immediate danger did not constitute a

testimonial statement for Sixth Amendment purposes." The *Stahl* court further explained as follows:

> [The *Davis* court] reasoned that "the nature of what was asked and answered [during the 911 call] * * *, again viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." (Emphasis sic.) *Id.* at [547 U.S. 814], 126 S.Ct. at 2276, 165 L.Ed.2d 224. Moreover, the call "was plainly a call for help against bona fide physical threat" and involved "frantic answers" given "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.* at [547 U.S. 814], 126 S.Ct. at 2276, 2277, 165 L.Ed.2d 224.

{¶ 27} Finally, as to the controlling caselaw, we note that Evid.R. 803 sets forth certain exceptions to the rule against hearsay, including the "excited utterance" exception. Evid.R. 803(2). In order for a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (a) the occurrence of an event startling enough to produce a nervous excitement in the declarant that stills his reflexive faculties so that his declarations are spontaneous and the unreflective and sincere expressions of his impressions and beliefs; (b) a statement made while still under the stress of excitement caused by the event; (c) a statement related to the startling event; and (d) the declarant had an opportunity to personally observe the matters in his declaration. *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993); *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166.

{¶ 28} Beginning with determining whether the statement was testimonial or nontestimonial, the record clearly establishes that A.B.'s statements during the

911 telephone call were made in order to obtain protection from immediate danger. They were made in an effort to resolve an immediate physical threat and were not made under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. The statements are not testimonial for purposes of the Confrontation Clause analysis.

{¶ 29} As to whether A.B.'s declarations constitute excited utterances, Renode insists that the declaration was not contemporaneous. However, the passage of time between the statement and the event is relevant but not dispositive of the question. *Taylor* at 301. Rather, "'[e]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.'" *Id.*, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219-220, 373 N.E.2d 1234 (1978).

{¶ 30} In addition, as to Renode's claim that the declaration was the product of reflective thought,

> Time is not necessarily the controlling factor in determining whether a statement qualifies as an excited utterance. The controlling factor is whether the declaration was made under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection. *State v. Smith* (1986), 34 Ohio App.3d 180, 190, 517 N.E.2d 933, 944. "Spontaneity and the lack of an opportunity to engage in reflective thought are the essential criteria in determining whether this exception to the hearsay rule is applicable in a given cause." *State v. Moorman* (1982), 7 Ohio App.3d 251, 252, 7 OBR 330, 332, 455 N.E.2d 495, 497.

*Id.* at 598.

{¶ 31} We conclude that the declaration identifying Renode was made within minutes and was immediately reported to the 911 dispatcher. At this time, according to Simones and A.F., A.B. was scared, breathing hard, and on "an adrenaline rush." From the record, the drive-by shooting dominated the events of the home and there were no intervening circumstances that could have influenced the declaration. The record does not support the claim that the declaration was the product of reflective thought and was not a spontaneous declaration.

{¶ 32} Finally, as to whether A.B. was properly positioned to identify the assailant, the record reveals that A.B. and A.F. exited the house as the shooting began and were directly in front of the home.

{¶ 33} From all of the foregoing, we conclude that the trial court did not abuse its discretion in determining that A.B.'s declaration was admissible as an excited utterance.

{¶ 34} As to Renode's additional argument regarding the trial court's rulings in Sanders's trial, this court, in *Sanders*, stated as follows:

> Sanders asks us to independently weigh the evidence and conclude that testimony by [Simones] was completely fabricated because she testified, in seeming contradiction to [A.B.'s testimony], that the [A.B.] claimed to have seen Sanders and Renode in the car, with a gun in Renode's hand, claiming that he would "come back and kill you and your family, your mother, as well as [the child's] * * * family."

> Although [A.B.] testified and denied hearing any voices coming from the car, that contradiction did not call the verdict into question. A.B. plainly identified both Sanders and Renode, an identification that was credible because of his familiarity with them and interaction with them on the night [J.D.] died. This familiarity mitigated concerns about any inconsistencies in portions of the witnesses' testimony.

*Id.*, 2018-Ohio-4603 at ¶ 19-20. Moreover, the court in *Sanders* dealt only with this contradiction between Simones's testimony and A.B.'s testimony during Sanders's trial; it did not rule on the issue of the admissibility of A.B.'s excited utterance.

{¶ 35} This assigned error is without merit.

## Mistrial

{¶ 36} In the second assigned error, Renode argues that the trial court erred in denying his motion for a mistrial after Simones's testimony because, he claims, she committed perjury in identifying Renode as the assailant in the drive-by shooting. He complains that due to her position inside the house she could not see the assailant, and she testified during Sanders's trial that she did not see the shooter.

{¶ 37} The granting or denial of a motion for mistrial rests within the sound discretion of the trial court. *State v. Treesh*, 90 Ohio St.3d 460, 480, 2001-Ohio-4, 739 N.E.2d 749; *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). A reviewing court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice. *Id.*

{¶ 38} A prosecuting duty of assuring that a criminal defendant receives a fair trial includes an obligation to (1) refrain from knowingly using perjured testimony, (2) disclose evidence favorable to the accused, and (3) correct testimony he knows to be false. *State v. Iacona*, 93 Ohio St.3d 83, 97, 2001-Ohio-1292, 752 N.E.2d 937, citing *State v. Staten*, 14 Ohio App.3d 78, 83, 470 N.E.2d 249 (2d Dist.1984). The defendant has the burden to "show that (1) the statement was

actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Id.* at 97; *State v. Smith*, 1st Dist. Hamilton No. C-170335, 2018-Ohio-4615, ¶ 22. However, the *Smith* court observed:

> "Mere inconsistencies in testimony do not establish the knowing use of false testimony by the prosecutor." *State v. Buck*, 2017-Ohio-8242, 100 N.E.3d 118, ¶ 76 (1st Dist.), quoting *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 41. Additionally, the fact "that a witness contradicts [herself] or changes [her] story also does not establish perjury." *Id.*

*Id.* at ¶ 24.

{¶ 39} In this matter, to be clear, the focus of Renode's motion for a mistrial was the introduction of A.B.'s excited utterance. (Tr. 755-759). The defense primarily challenged A.B.'s demeanor and reflection on the incident, and it challenged Simones insofar as her location when she heard A.B.'s statement. Thus, Renode argued that Simones did not reliably convey the excited utterance offered by the state. In evaluating this claim, we must acknowledge that A.B. did testify during Sanders's trial and "plainly identified both Sanders and Renode, an identification that was credible because of his familiarity with them and interaction with them on the night [J.D.] died." *Sanders*, 2018-Ohio-4603 at ¶ 20. Moreover, while Simones may have been unclear or confused as to her precise location when she heard A.B.'s remarks, there is overwhelming evidence in this record that A.B. was under an "adrenaline rush," scared, and upset. Immediately after the shooting, and within minutes of the shooting, Renode was named as a suspect. We additionally note that during Sanders's trial, the defense claimed that Simones's

testimony was "completely fabricated because she testified, in seeming contradiction to [A.B.], that claimed to have seen Sanders and Renode in the car, with a gun in Renode's hand, claiming that he would 'come back and kill you and your family, your mother, as well as [A.B.'s] * * * family.'" *Id.* at ¶ 19. This court concluded that this inconsistency did not taint the verdict. *Id.* at ¶ 20.

{¶ 40} As to the issue of the veracity of Simones's own observations, we note that she was cross-examined about her inability to identify Renode as the assailant in Sander's trial, and questioned as follows:

Q. [You were asked in Sanders's trial,] ["]Did you notice anything about the car? Windows up? Windows down?["]

A. ["]The back windows were down.["] ["]Did you see in?["] Your answer: "No."

Q. ["]Why not?["]

A. ["]When I hit the corner of the house, all I seen was the back windows. It was dark outside." Do you recall that testimony now?

A. Yeah, I remember talking to that detective.

Q. So, what's the truth, ma'am? Then or now, which one do you want the jury to believe? Which one?

A. But I'm being honest when I stepped outside, when that car was pulling off as we [were] coming out the door, my driveway, I glanced at his face and I heard her say go.

Q. Okay. Ma'am, you were asked directly by [the prosecuting attorney], did you see in the windows, and your answer was no. Would you like to take a look at the transcript page?

A. "No."

Q. Would you like to take a look at the entire transcript and let this jury know whether or not you said to that previous jury that you saw a glimpse of Jacque Renode? Would you like to look at that entire transcript?

A. No.

Q. If I tell you that it's not in that transcript, that you never testified to that, will you dispute that?

A. I mean, I don't understand.

Q. Well, did you say it or not in the previous trial that you saw Jacque Renode?

A. I believe I did.

{¶ 41} After that, the prosecuting attorney questioned Simones as follows:

Q. That original line of questioning took place about ten months after the fact, is that correct?

A. Correct.

Q. At this point we're close to three years away from the event, isn't that right?

A. Most definitely.

Q. I just want to ask you if there were answers you gave then that are different from the answers you've given now, why is that?

A. My brain ain't exactly on point. I don't remember.

Q. You don't remember what, testifying?

A. I don't remember testifying. I don't remember half of the things I've talked to you guys about.

Q. Why?

A. It's been so long and then me dealing with my own son's [A.B.] murder.

{¶ 42} From the foregoing, we cannot say that the inconsistency establishes perjury. Moreover, Simones was thoroughly cross-examined about the issue, so it was for the jury to resolve the inconsistency. We additionally note that compelling evidence supports the conviction, including the heavily blood stained pants with the DNA evidence that was linked to Renode, and the nature of the blood evidence, including blood spatter that is associated with the administration of a forcible impact. Renode also attempted to obtain lighter fluid immediately after the stabbing, fled the scene before police arrived, and continued to evade capture months later in Indianapolis.

{¶ 43} We find no abuse of discretion. This assigned error is without merit.

## Sufficiency of the Evidence

{¶ 44} In the third assigned error, Renode argues that his convictions are not supported by sufficient evidence. He asserts that there is no evidence linking him to the knife recovered from the scene, and that although he was linked to the pants recovered from the house, there is legally insufficient evidence that he was the assailant. He also maintains that legally insufficient evidence established that he was the assailant in the drive-by shooting.

{¶ 45} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would support a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *following Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The state may use direct evidence, circumstantial evidence, or both, in order to establish the elements of a crime. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Circumstantial evidence is "proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow." *State v. Seals*, 8th Dist. Cuyahoga No. 101081, 2015-Ohio-517, ¶ 32.

{¶ 46} Further, as this court noted in *Sanders*,

> the jury could rationally find that Sanders fled the jurisdiction with Renode, an act that showed a consciousness of guilt. *State v. Eaton*, 19 Ohio St.2d 145, 249 N.E.2d 897 (1969), paragraph six of the syllabus ("Flight from justice * * * may be indicative of a consciousness of guilt."). Testimony showed that warrants were issued for the arrest of Sanders and Renode just days after the shooting. It is unclear when the two left Ohio, but Renode was forcibly apprehended six months later in Indiana.

2018-Ohio-4603 at ¶ 10.

{¶ 47} The state's evidence indicated that a few days after Davis permitted Renode and Sanders to move in with her and her sons, she made them leave due to their ongoing arguments with J.D. However, they returned on November 27, 2016, Renode and Sanders began beating on the door, and Renode threatened that if she

did not let him in, he was "coming back [to] kill all you guys." Renode and Sanders fled before police arrived but returned again a few days later. At that point, Davis agreed to let them stay until the following Monday. On December 3, 2016, Sanders and Renode were home with the children, and Renode improvised a song, singing that he was "going to body this n----."

{¶ 48} J.D. became intoxicated, and when Davis returned, she was upset with Renode, Sanders, and J.D., and that she sent J.D. to his room where he remained, lying on the floor of his room, for the rest of the night. Davis also permitted Renode and Sanders to sleep in a bed in J.D.'s room. A few hours later, Sellers saw Renode coming downstairs, and Renode joined him in walking to the nearby store. It is undisputed that Renode fled the store with lighter fluid, before being stopped by Sellers. While Sellers and Renode were gone, Davis noticed that the door to J.D.'s room was propped in front of the doorway. She went inside to investigate and saw J.D. motionless in the blood-stained room. He had been both strangled by force and stabbed, and paramedics determined that he was dead on arrival. Renode subsequently ran into the house, then returned to the steps, and abruptly said, "I gotta get the f--- outta here," before fleeing the scene. Pants with Renode's DNA were later recovered from the home. The pants had multiple blood stains, including spatter stains indicative of an impact of force into blood that gets projected into the area of impact. The pants also had drip stains, saturation stains, and blood transfer stains.

{¶ 49} In the days following J.D.'s death, Davis, Sellers, and Davis's other child were still staying with Simones. As A.B. and A.F. walked outside, a parked car backed up and pulled forward as an occupant fired shots toward the house, striking a car parked in the driveway. Simones testified that as she looked out, she got a "glimpse" of Renode and heard Sanders shout, "Go, go!" Simones also testified that A.B. excitedly declared that Renode was the assailant. Simones called the police and within a few minutes, told police that the shooter was J.D.'s assailant. Renode was eventually captured by SWAT officers in Indianapolis.

{¶ 50} From the foregoing, we conclude that after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of murder, felonious assault, aggravated menacing, and intimidation of a crime witness. The crimes were proven beyond a reasonable doubt. The record contains sufficient evidence to support Renode's convictions.

{¶ 51} This assigned error lacks merit.

**Manifest Weight of the Evidence**

{¶ 52} In the fourth assigned error, Renode argues that his convictions are against the manifest weight of the evidence. He asserts that it is extremely suspicious that Sellers located the bloody pants inside the house after the police had already searched it and that Simones was not credible when she stated that she saw a "glimpse" of Renode during the drive-by shooting, and that A.B. excitedly identified Renode as the shooter.

{¶ 53} "[W]eight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Weight of the evidence concerns "the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 54} Furthermore, "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The factfinder "is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶ 55} Upon review, we cannot say that the jury lost its way and created a manifest miscarriage of justice by convicting Renode of the offenses. Although Sellers found the bloody pants after the police had searched the house, it is

undisputed that the police did not search the room where the pants were found because this room was filled with dirty clothing and the uninflated mattress, and appeared to have no connection to the bloody crime scene. Moreover, DNA evidence linked Renode to the pants. Neither Sellers's nor A.B.'s DNA was found on the pants. Additionally, it is undisputed that Renode had made prior threats against the family, sang about "body[ing] a n----," and fled from the scene to Indianapolis. As to the drive-by shooting, evidence indicated that Renode was the shooter and that Sanders shouted, "Go, go!" The convictions are not against the manifest weight of the evidence.

{¶ 56} This assigned error is without merit.

{¶ 57} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

*Patricia Ann Blackmon*

PATRICIA ANN BLACKMON, PRESIDING JUDGE

MICHELLE J. SHEEHAN, J., CONCURS;
FRANK D. CELEBREZZE, JR., J., CONCURS
WITH SEPARATE OPINION ATTACHED

FRANK D. CELEBREZZE, JR., J., CONCURRING:

{¶ 58} I concur with the majority's opinion and resolution of this matter. I respectfully write separately, however, to express my disgust and horror at the facts of this case. In this jurist's twenty years of experience as an appellate judge, eight years as a common pleas felony judge, and seven years as a civil trial attorney, I have never seen a case as heinous as this brutal murder of a young boy in his mother's home.

{¶ 59} The state noted at the sentencing hearing that appellant has *never* accepted any responsibility for his actions, nor has he *ever* expressed remorse. I agree wholeheartedly with the trial court's characterization of this case as a reprehensible act of violence and the "senseless, horrible, and violent" murder of a child who was presumably sleeping in his bed who had no issue with appellant.

{¶ 60} Sadly, appellant's vile conduct and utter disregard for life did not end there. Following the murder, appellant and his girlfriend attempted to intimidate and potentially harm A.B. and A.F. by shooting at them as they stood in a driveway.

A.B. and A.F. were friends with J.D., and A.B. was present in the house the night of the murder. Thankfully appellant and his girlfriend were unsuccessful, and neither teenager was injured in the shooting. Later, though, as if the individuals involved in this matter had not suffered enough, A.B. was subsequently murdered in another shooting, which, at the time of appellant's trial, remained unsolved.

{¶ 61} The lengthy prison sentence imposed by the trial court, life imprisonment with parole eligibility after 21 years, was undoubtedly warranted and supported by the record in this case. I hope the families of the victims may find closure.