[Cite as *State v. Church*, 2024-Ohio-2356.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,            :

                             Nos. 112224 and 113042

    v.                             :

TEMARCUS CHURCH,                         :

    Defendant-Appellant.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; MODIFIED IN PART;
                 AND REMANDED
**RELEASED AND JOURNALIZED:** June 20, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-21-665390-A and CR-21-665502-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John D. Kirkland and Ayoub Dakdouk, Assistant Prosecuting Attorneys, *for appellee.*

P. Andrew Baker, *for appellant.*

ANITA LASTER MAYS, P.J.:

{¶ 1} Defendant-appellant, Temarcus Church, appeals his convictions and sentences in two criminal cases, sustained after jury trials. For the reasons that follow, we modify Church's sentence in Cuyahoga C.P. No. CR-21-665502-A but otherwise affirm the convictions and sentences in that matter. We affirm the

convictions and sentences in Cuyahoga C.P. No. CR-21-665390-A, but we remand that matter to the trial court with instructions to correct clerical errors in the sentencing journal entry.

## I.    Factual Background and Procedural History

{¶ 2} We have consolidated Church's appeals in two criminal cases, both filed on November 23, 2021.  In this opinion, we first describe the charges brought and evidence adduced in each case, presenting the cases in chronological order based on the date of the alleged offenses.  Next, we describe the sentencing hearing (at which the trial court imposed sentence in both cases) and procedural history on appeal. We then analyze and rule upon the assignments of error.

### A.    Cuyahoga C.P. No. CR-21-665390-A — March 2020 Shooting

{¶ 3} In Cuyahoga C.P. No. CR-21-665390-A, a Cuyahoga County Grand Jury indicted Church on the following charges:

- Count 1:  Felonious assault, in violation of R.C. 2903.11(A)(2), with a notice of prior conviction under R.C. 2929.13(F)(6) and a repeat-violent-offender specification under R.C. 2941.149(A).

- Count 2:  Discharge of a firearm on or near prohibited premises, in violation of R.C. 2923.162(A)(3).

- Count 3:  Having weapons while under disability, in violation of R.C. 2923.13(A)(2).

- Count 4:  Having weapons while under disability, in violation of R.C. 2923.13(A)(3).

- Count 5:  Improperly handling a firearm in a motor vehicle, in violation of R.C. 2923.16(B).

- Count 6:   Carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), with a "furthermore clause" that the weapon

involved was a firearm that was either loaded or for which the offender had ammunition ready at hand.

- Count 7: Domestic violence, in violation of R.C. 2919.25(A).

- Counts 8–11: Criminal damaging or endangering, in violation of R.C. 2909.06(A)(1) with a "furthermore clause" that the violation of this section created a risk of physical harm to any person.

- Count 12: Obstructing official business, in violation of R.C. 2921.31(A).

{¶ 4} Counts 1, 2, 3, and 4 carried 1-year, 3-year, and 54-month firearm specifications under R.C. 2941.141(A), 2941.145(A), and 2941.145(D), respectively. Count 3 also carried an 18-month firearm specification under R.C. 2941.141(D).

{¶ 5} Counts 1, 3, 4, 5, 8, 9, 10, and 11 carried a forfeiture specification under R.C. 2941.1417(A), seeking forfeiture of a Smith & Wesson 9 mm handgun. Count 4 carried two such specifications.

{¶ 6} These charges stemmed from an investigation into a shooting that occurred on March 20, 2020. Witnesses reported that someone was shooting a gun on Selzer Avenue in Cleveland, and police identified damage to several vehicles on the street consistent with damage caused by bullet strikes. A little while later, police encountered Temarcus Church in a vehicle several miles away and located a firearm underneath the seat he was occupying. The state's theory of the case was that Church was the shooter on Selzer Avenue and that he had been shooting at his child's mother.

{¶ 7} Trial on the charges commenced on July 25, 2022. The state presented ten witnesses in its case-in-chief.

### 1. The Examination of Connie Donley

{¶ 8} Connie Donley testified that in March 2020 she lived at a house on Selzer Avenue in Cleveland, near the intersection of West 24th Street; she drove a gray Pontiac Grand Am at the time.

{¶ 9} On March 20, 2020, Connie was "drifting off to sleep" around 11 p.m. when she heard the sound of gunfire "like it was right outside my window." She heard "a lot" of shots but could not count them. She dropped out of her bed to the floor and called 911. Then she looked out a bedroom window "to see what was going on." She saw a black male standing outside of a white car, on the "[d]river's side with the door open." The male had a gun in his hands, but he was not firing it at that time. He was holding the gun "parallel to the ground."

{¶ 10} The state played a recording of Connie's 911 call. Connie described the male as wearing a yellow puffy jacket. She testified that he was standing under a streetlight "and I saw the yellow jacket, what appeared to be a white shirt or light-colored shirt." She thought he had short hair or no hair. She did not see any other vehicles driving or people out on the street that night.

{¶ 11} The state showed Connie a still image from a police body-worn camera taken when police encountered Church on a highway later in the day on March 20, 2020, and Connie confirmed that the clothing Church was wearing in the photograph was consistent with the jacket that she saw on the night of the shooting.

{¶ 12} The day after the shooting, Connie noticed that her Pontiac Grand Am, which had been parked outside her house, had a flat tire and a hole going through the fender into the tire.

{¶ 13} On cross-examination, Connie admitted that she was talking to the 911 operator at the same time that she was speaking with her daughter, who was in the house with Connie. Her daughter told Connie that she thought the white car was a Chevrolet Impala. Connie further admitted that she could not identify who the man was holding the gun. She did not tell the 911 operator or the police that she thought the man had short or no hair. She never saw anyone actually firing a gun, never saw the man get into the white car, and did not see the car drive away; she was "hiding for [her] life."

## 2. The Examination of Jessica Donley

{¶ 14} Jessica Donley testified that she lived in the same house as Connie in March 2020. Jessica was in the kitchen at approximately 11 p.m. when she noticed a tan car "speeding" past. Behind the tan car was a white car, which pulled up in front of a neighbor's house. Jessica recognized that the car was a Chevrolet; she thought at the time of the shooting that it was an Impala but testified that she may have been mistaken.

{¶ 15} A black male wearing a yellow puffy jacket got out of the white car and "started shooting down the street." It seemed to Jessica that he was shooting at the tan car. Jessica described that he was holding the gun "[s]ideways with his left hand,

not aiming at anything really." She did not count how much shots the man fired, but it was "a lot."

{¶ 16} Jessica was watching the man the entire time he was shooting. She described that he was wearing a white shirt, was of "average build," and was "average height." She saw the man get back into his car and drive east down the street.

{¶ 17} Jessica went outside after the man drove away and noticed that Connie's car had a bullet hole through the fender and into the tire. On redirect, she said that the next day she learned that at least two other vehicles belonging to neighbors had also been damaged in the shooting.

{¶ 18} On cross-examination, Jessica admitted that she could not identify the man who was shooting other than the description she gave. She further admitted that she never saw a dark-colored car drive past the man at a slow speed and did not hear Connie say that she observed that either.

### 3. The Examination of Jerry Bryant

{¶ 19} Jerry Bryant testified that he lives on Selzer Avenue in Cleveland, across the street and diagonally from Connie and Jessica Donley. On March 20, 2020, Bryant was watching television when he "heard a bunch of shooting." Bryant looked out a front window and saw "the flash of the firearm." He could not see who was shooting. He saw a "car going down the street in a hurry, and then all of a sudden another car * * * behind him." He quickly backed away from the window for his safety.

{¶ 20} He later observed that there were multiple bullet holes and a dent in the rear of his truck, which had been parked on the street.

### 4. The Examination of Niccolo Angelino

{¶ 21} Niccolo Angelino testified that he is employed as a police officer in Cleveland; he is a patrol officer. At approximately 11 p.m. on March 20, 2020, Angelino and his partner — Hector Vazquez — responded to Selzer Avenue in response to a call for service. Multiple callers had reported a person shooting in the area.

{¶ 22} When the officers arrived on scene, witnesses directed them to the area where the person had been shooting. The officers observed multiple cartridge cases on the ground at the location to which they had been directed. Angelino interviewed witnesses while Vazquez collected the cartridge cases. The officers found 15 cartridge cases at the scene. Angelino also observed that two vehicles had flat tires and a truck had multiple bullet holes.

{¶ 23} Officers from the Special Investigations Unit ("SIU") — who would normally come to a crime scene like this to take photographs — were not able to respond to the scene because they were engaged in other work in another part of the city.

{¶ 24} Angelino and Vazquez were on the scene for approximately 15 minutes. After collecting the cartridge cases in an evidence bag, they cleared the scene and started heading toward another call for service.

{¶ 25} On the way to that other call, a call came over the radio from a police officer who reported that there was a shooting near West 25th Street and Denison Avenue. Because of their proximity to that call, Angelino and Vazquez turned around and responded to that scene.

{¶ 26} As they arrived, Angelino observed that other officers had stopped two vehicles: a white vehicle and a blue Nissan Altima. Officers informed Angelino that a female named "Dina" had flagged them down to report that her child's father had shot at her and that a male had been detained. Officers told Angelino that a firearm had been located under the male's seat. Angelino understood that the male had been in the white car with a female.

{¶ 27} Angelino then approached the male — who Angelino identified in court as Church — and, after advising him of his rights, questioned him.

{¶ 28} Angelino described the conversation as follows:

[Church] had told me that he had contacted the female that was with him, and that he wanted her to drive him over to the west side to get something to eat. While they were over there, he saw his child's mother. And they were driving down Selzer, and she started chasing him. So then they chase each other up on the highway, and that's when they stopped to flag down the police officer.

{¶ 29} Angelino also interviewed the female who he understood had been in the white car. The female reported that "they were not going to pick up food, that he wanted a ride to the west side to his mom's house."

{¶ 30} Angelino also interviewed Dina Turner ("Turner"), who had been in the blue Nissan Altima. Angelino understood that Turner was the mother of

Church's child.  Angelino observed that the Nissan Altima had "multiple gunshot holes in the rear" and that the tire also had a bullet hole.

{¶ 31} Angelino recalled that "Dina" said the following:

> She said she was in the area of * * * 23rd and Selzer to pick up her son when she was followed by the suspect.  And that he was standing outside the car, shot at her, and they took off, like trying to get away from them, and that's when they ended up on the highway after they flagged down an officer.

{¶ 32} Officers towed the white vehicle to a police parking lot for evidence processing.

{¶ 33} After officers arrested Church, Church told them that he had COVID-19, so police contacted emergency medical providers to assess his symptoms.  Then another police zone car transported him to the county detention center.

{¶ 34} Angelino identified a Smith & Wesson 9 mm handgun as the firearm found under Church's seat in the white vehicle.  Angelino identified that the weapon had a capacity of "15 rounds."  When police recovered it, there were no bullets inside the chamber or magazine.

{¶ 35} On cross-examination, Angelino admitted that Connie Donley told him, at the scene on Selzer Avenue, that she saw a dark-colored car drive past the shooter at a slow speed.  Connie further told him that "the male pulled out a gun a fired at that vehicle."  It was Angelino's understanding, based on Connie's report, that Connie had actually seen the male firing the gun.  He further admitted that, while he did not recall whether anyone mentioned a tan car to him that night, there was no mention of a tan car in his report and he would have made a note if someone

had told him that. He further admitted that no one on scene made it apparent whether the shooter was the driver or the passenger in the car.

{¶ 36} Angelino further admitted that, at the scene on the highway, Church was identified as being a passenger. The car in which he was a passenger was identified as being owned by Davia Clements. It was Angelino's understanding that Clements was driving that vehicle.

{¶ 37} Angelino further admitted that Church's hands were not swabbed for gunshot residue upon his arrest because SIU was not available to respond to either scene that night. Angelino took no steps to process Church or his clothing to determine whether there was anything of forensic value. As police began taking Church into custody on the highway, Turner began yelling at him; she appeared "angry" and "upset" with Church.

### 5. The Examination of Hector Vazquez

{¶ 38} Hector Vazquez testified that he is employed as a police patrol officer in Cleveland. Vazquez responded with Angelino to the report of shots fired on Selzer Avenue. Vazquez collected 15 9 mm cartridge cases from the scene. He estimated he was on the scene for 15 to 20 minutes.

{¶ 39} Vazquez also responded with Angelino to the highway scene. As he exited his patrol car, he observed a blue Nissan and a white Chevrolet. The Nissan appeared to have a flat tire "as if a bullet struck it." Turner was associated with the Nissan. Turner reported that she had been shot at.

{¶ 40} On cross-examination, Vazquez admitted that, to his knowledge, no testing was performed on the gun, the cartridge cases, or the white Chevrolet with respect to fingerprints or DNA. He further admitted that no photographs were taken documenting the location where officers found the cartridge cases on Selzer Avenue.

### 6. The Examination of Daniel Moore

{¶ 41} Daniel Moore testified that he is employed in the Cleveland 911 dispatch center, working in technical administrative operations. He authenticated two recordings of 911 calls made on March 20, 2020, related to the shooting on Selzer Avenue. The state played the recordings for the jury.

### 7. The Examination of Spencer Cardona

{¶ 42} Spencer Cardona testified that he is employed as a police patrol officer in Cleveland. On March 20, 2020, Cardona responded to a vehicle accident on the highway, near the interchange between Interstate 71 and Interstate 90. Cardona's assignment was to block off traffic. As he was doing so, he and other officers were flagged down by a female who reported that a male in a nearby vehicle had shot at her. Cardona recalled that the complainant's last name was Turner.

{¶ 43} Cardona and other officers approached the suspect vehicle and noted that there was a female in the driver's seat. Cardona recalled that the driver's last name was Clements. Church was in the passenger seat, wearing a "bright yellow puffy coat." The complainant reported that Church was the person who had shot at her.

{¶ 44} Cardona asked Clements whether there were any firearms in the vehicle. Clements said she was not sure.

{¶ 45} Officers searched Clements' vehicle. Cardona searched the area around and under the driver's seat, finding nothing of note. Cardona searched the front passenger side of the vehicle, and he found a firearm underneath the passenger seat. A magazine was loaded in the firearm, but there were no bullets in the weapon. Cardona secured the weapon, and it was later transferred to officers from the Second District in connection with the shooting on Selzer Avenue.

{¶ 46} On cross-examination, Cardona admitted that he never saw Church in the driver's seat of Clements's car. He further admitted that the firearm was far enough under the front passenger seat that a person sitting in the rear passenger seat could have reached it. Cardona further admitted that he took no precautions, except for wearing gloves, to preserve the firearm for fingerprint or DNA examination. Finally, he admitted that no one examined Clements or Church for the presence of gunshot residue.

### 8. The Examination of Jonnatan Sanchez

{¶ 47} Jonnatan Sanchez testified that he is employed as a police patrol officer in Cleveland. Sanchez responded with Cardona to the traffic accident on the highway on March 20, 2020. He confirmed that, while they were on that scene, a woman flagged them down and reported that the occupants of another vehicle had shot at her. The vehicle she pointed to was a white Chevrolet.

{¶ 48} There were two occupants in the white Chevrolet. A female was driving and a male was in the passenger seat wearing a "yellow puffy jacket" with "either dark blue or grayish shirt underneath it."

{¶ 49} The complainant was driving a dark blue Nissan Altima. Sanchez observed two holes in that vehicle, which also had a flat tire.

{¶ 50} Officers ordered the male to exit the white Chevrolet. Sanchez patted him down, finding no weapons on his person. Cardona thereafter searched the vehicle and found a firearm underneath the passenger seat. Sanchez placed the male in handcuffs, after which the male "became irate." The male claimed that the firearm was not his and that he was "just getting a ride" in the vehicle. The male claimed that "he was having some problems" with his child's mother, that she was "not helping him out or something like that." Sanchez identified that the child's mother was the victim in the blue Nissan Altima.

{¶ 51} On cross-examination, Sanchez admitted that officers from the Second District did not arrive at the highway scene until after the firearm had been recovered from the white Chevrolet. He further admitted that it was his recollection that the officers did not arrive for an hour after he reported that they had evidence potentially related to a shooting in the Second District.

{¶ 52} Sanchez further admitted that there were multiple times during the police interaction with Church and Clements that the complainant ran up and yelled at Church and Clements. Sanchez confirmed that Church had no weapons,

ammunition, drugs, or other contraband on his physical person when he was searched.

{¶ 53} Sanchez further confirmed that the firearm was tucked underneath the seat; it was not visible by a person looking into the car from the outside.

{¶ 54} Church told Sanchez that he did not want to go back home with the driver of the blue Nissan.

### 9. The Examination of Edward Lattyak

{¶ 55} Edward Lattyak testified that he is employed as a firearm and tool mark examiner at the Cuyahoga County Medical Examiner's crime laboratory. He is the firearm section supervisor at the laboratory. The defense stipulated to Lattyak's expertise in the field of firearm and tool mark examination.

{¶ 56} Lattyak examined the firearm recovered from the white Chevrolet and the cartridge cases recovered from Selzer Avenue. He test fired the firearm and compared the test cartridge cases with those recovered from Selzer Avenue. He concluded, based upon his examination, that the firearm recovered from under Church's seat fired all the cartridge cases found on Selzer Avenue.

{¶ 57} Lattyak admitted that his examination would not reveal who fired the gun or when the cartridge cases were fired from the gun.

### 10. The Examination of John Freehoffer

{¶ 58} John Freehoffer testified that he is employed as a police detective in Cleveland.

{¶ 59} Dina Turner and Church have a child together.

{¶ 60} Turner called Freehoffer approximately two days after flagging down officers to help her on the highway. She told Freehoffer that "she bought the car with the bullet holes in it" and said that Church did not shoot at her. She did not mention the flat tire her car had on the highway. She claimed to have lied to police about the incident.

{¶ 61} On cross-examination, Freehoffer identified a notarized affidavit executed by Turner, in which she averred that she lied about Church shooting at her. He said he believed the affidavit was a lie, but he admitted that Turner had not been charged with lying to police.

{¶ 62} Freehoffer further admitted that, while police seized Church's clothing — including the yellow puffy jacket — at the time of his arrest, no one tested the jacket for gunshot residue. On redirect, Freehoffer said that Church had been released from detention and taken his clothes with him before Freehoffer was assigned the case.

### 11. The Stipulation to Prior Convictions

{¶ 63} Church stipulated that he was previously convicted of aggravated robbery with a one-year firearm specification and felonious assault in Cuyahoga C.P. No. CR-10-534110. Church further stipulated that he was previously convicted of drug trafficking in Cuyahoga C.P. No. CR-17-621937.

### 12. The Verdict

{¶ 64} Church moved for acquittal on all charges pursuant to Crim.R. 29. The trial court granted the motion as to one count of criminal damaging (Count 9),

reasoning that there was no evidence presented regarding any damage to the particular vehicle that was the subject of that count. The court denied the motion as to the remaining counts.

{¶ 65} The defense rested without presenting witnesses. Church renewed his Crim.R. 29 motion after the close of evidence as to the remaining charges, and the court denied the motion.

{¶ 66} On August 2, 2022, the jury returned its verdicts.

{¶ 67} The jury found Church guilty on Counts 3 and 4 — having weapons while under disability with 1-year, 18-month, 3-year, and 54-month firearm specifications and forfeiture specifications. It found Church guilty of Count 6 — carrying a concealed weapon with a "furthermore clause" that the weapon was a firearm that was either loaded or for which Church had ammunition ready at hand.

{¶ 68} The jury acquitted Church of Count 5 (improper handling of a firearm in a motor vehicle with attached specifications) and Count 12 (obstructing official business).

{¶ 69} The jury failed to reach a verdict as to the remaining counts (Counts 1, 2, 7, 8, 10, and 11), which charges were voluntarily dismissed by the state at the sentencing hearing.

**B.    Cuyahoga C.P. No. CR-21-665502-A — November 2020 Shooting**

{¶ 70} In Cuyahoga C.P. No. CR-21-665502-A, a Cuyahoga County Grand Jury indicted Church for the following alleged offenses:

- Count 1: attempted murder in violation of R.C. 2923.02 and 2903.02(A).

- Count 2: aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony.

- Count 3: aggravated robbery in violation of R.C. 2911.01(A)(3), a first-degree felony.

- Count 4: felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony.

- Count 5: felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony.

- Count 6: having weapons while under disability in violation of R.C. 2923.13(A)(3), a third-degree felony.

- Count 7: having weapons while under disability in violation of R.C. 2923.13(A)(2), a third-degree felony.

{¶ 71} Each count carried one-year, three-year, and 54-month firearm specifications set forth, respectively, in R.C. 2941.141(A), 2941.145(A), and 2941.145(D).  Counts 1 through 5 carried a notice of prior conviction pursuant to R.C. 2929.13(F)(6) and a repeat-violent-offender specification pursuant to R.C. 2941.149(A).  Counts 6 and 7 carried an 18-month firearm specification set forth in R.C. 2941.141(D).

{¶ 72} The charges stemmed from an investigation into an armed robbery and shooting that occurred at a gas station on Woodland Avenue in Cleveland on

November 16, 2020. The state's theory of the case was that Church accompanied an unidentified suspect to the gas station that night. We will refer to the other suspect as "the Shooter" in this opinion. The state believes that Church (armed with a handgun) and the Shooter entered the gas station, completed a credit-card transaction, went back to a car together, and waited in the car at a gas pump. The state argued that Church gave the Shooter the gun that Church was carrying. The Shooter then approached a man who was exiting the gas station and robbed him. As the man attempted to back away, the Shooter shot him.

{¶ 73} The defense argued to the jury that Church was not involved in the robbery and shooting.

{¶ 74} A jury was impaneled on October 19, 2022, and trial commenced with opening statements on October 20, 2022. The state called 14 witnesses in its case-in-chief.

### 1. The Examination of DeMero Moorer

{¶ 75} DeMero Moorer testified that on November 16, 2020, he left his work at 8:30 p.m. He went to the Valero gas station located on Woodland Avenue in Cleveland, at the intersection of Woodland and Bundy Drive. When he arrived, he noticed a person looking at him from a car "on the other side of the gas pump from me." The person was giving him what he characterized as a mean look. Moorer exited his car and walked to the store.

{¶ 76} As Moorer was walking back to his car, the person who had been staring at Moorer earlier "[ran] up on me and he puts a gun on my stomach and then

he tells me, 'don't move.'"  The assailant had the gun in the pocket of a hoodie, but Moorer felt the barrel against his stomach.  The assailant pulled Moorer toward the side of the building.  The assailant told Moorer to "empty [Moorer's] pockets."  The assailant took Moorer's wallet; the wallet contained cash, several bank cards, and identification cards.  Moorer backed away from the assailant slowly while pleading for his life.  When Moorer was a few steps from the store's front door, he felt like he could "make a run a for it."  Moorer turned to run into the store, at which point the assailant shot him; Moorer was shot once, in the stomach area, and the bullet passed through and exited his body.

{¶ 77} Moorer made it inside the store and pleaded with the store clerk and others inside the store for help; no one helped him.  Moorer called the police on his own.  When the clerk failed to give him the gas station's address, Moorer told the dispatcher his own address — which was located across the street from the gas station — and drove himself home while attempting to keep pressure on his wound.  The state played a recording of this 911 call.  Emergency responders transported Moorer from his residence to the hospital.  Moorer was in the hospital for several days, recovering.

{¶ 78} The state played surveillance video from inside and outside of the gas station, and Moorer confirmed that the video accurately depicted what happened to him that night.

{¶ 79} Around two weeks after the shooting, detectives showed Moorer a lineup of six photographs.  Moorer identified that the face in one of the photographs

resembled the face of the person who shot him. Moorer said that he had only seen his attacker from "the eyebrows to the top of the chin near the lip." Moorer identified that his assailant wore an unkempt beard, which could be seen around a black face covering, which concealed the assailant's mouth.

{¶ 80} On cross-examination, Moorer admitted that he was not certain that the person who was "mean-mugging" him was the same person who shot him. But he said that he believed it was the same person because the person was "a light skinned male with the same black hoodie" who appeared to have "the same face." He further admitted that he did not see anyone else in the assailant's car.

{¶ 81} Moorer also admitted that, during the robbery, he tried to keep his wallet from being taken, walking backward and trying to get away from the assailant.

{¶ 82} He further admitted that he told police the assailant had a "Glock," but he meant that he knew for sure it was a pistol. Finally, he admitted that — besides the assailant — he did not see anyone else at the gas station "in connection with the encounter." There was someone else pumping gas, but no one else approached him. Moorer admitted that no one else in the photo lineup, to his knowledge, had anything to do with the shooting; he did not see any of the other people at the gas station on the night he was shot.

## 2. The Examination of Sujit Roy

{¶ 83} Sujit Roy testified that he owns the Valero-branded gas station where Moorer was shot. After the shooting, he reviewed surveillance video with a police detective and identified that two people — one of whom was the person Moorer

identified as the shooter — approached the counter and tried to use a credit or debit card "two or three times" for a transaction. The card was declined each time, and Roy did not have those declined receipts. Roy gave the detective the contact information for the credit-card-processing company.

### 3. The Examination of Dr. Daniel McFarland

{¶ 84} Dr. Daniel McFarland testified that he is a medical doctor employed as an emergency-medicine physician at University Hospitals. He treated Moorer's gunshot wound.

{¶ 85} Moorer presented to the emergency room with two visible wounds, one to his "left flank" and one to his "upper abdomen." While there are a number of vital physiological structures in that area of the body, the bullet that struck Moorer missed them all. The hospital team determined that the injuries were from a single gunshot wound and that the wound was not life-threatening. Moorer was observed for around 24 hours and then discharged.

{¶ 86} On cross-examination, Dr. McFarland admitted that he only had a "vague" memory of treating Moorer, the incident having occurred two years prior. His testimony was based on his review of the medical records from the event.

### 4. The Examination of Lindsey Deetz

{¶ 87} Lindsey Deetz testified that she is employed as a forensic scientist by the Bureau of Criminal Investigation ("BCI") in Richfield, Ohio. In that role, she examines items of evidence, collects samples for DNA analysis, performs certain steps of the DNA-analysis process, and does DNA comparisons. The state offered

her as an expert witness in DNA analysis, and the trial court accepted her as an expert.

{¶ 88} Deetz performed DNA analysis on swabs taken from a cartridge case recovered from the scene of the shooting. No DNA was found on the cartridge case.

{¶ 89} On cross-examination, Deetz admitted that — to her knowledge — no other item of evidence was submitted to BCI for purposes of DNA examination.

### 5. The Examination of Redmond Dyer

{¶ 90} Redmond Dyer testified that he is employed as a deputy sheriff in the scientific identification unit of the Cuyahoga County Sheriff's Department. The state offered Dyer as an expert witness in the field of fingerprint comparison, and the trial court accepted him as an expert.

{¶ 91} Dyer identified a fingerprint card containing the fingerprints of a defendant named Temarcus Church, collected in Cuyahoga C.P. No. CR-22-665502-A. He also identified a fingerprint card containing the fingerprints of a defendant named Temarcus Church, collected in Cuyahoga C.P. No. CR-17-621937. He also identified a fingerprint card containing the fingerprints of a defendant named Temarcus Church, collected in Cuyahoga C.P. No. CR-10-534110. He explained that an individual's fingerprints are taken when they are booked into the county jail after an arrest.

{¶ 92} Dyer compared the fingerprints on each of the three fingerprint cards and determined that the fingerprints on each came from the same source, who was identified on the cards as a person named Temarcus Church.

{¶ 93} Dyer then fingerprinted the defendant, Temarcus Church, in open court and compared those fingerprints to the three fingerprint cards. He determined that the defendant was the source of all the fingerprints on those cards.

### 6. The Examination of Krystal Lawyer

{¶ 94} Krystal Lawyer testified that she is employed by the Cuyahoga County Clerk of Courts as the manager of that office's criminal division. Lawyer identified and authenticated two journal entries from the Cuyahoga County Court of Common Pleas. The journal entries — from Cuyahoga C.P. Nos. CR-10-53410 and CR-17-621937-B — established that Church had previously pleaded guilty to several offenses, including: trafficking, a fourth-degree felony violation of R.C. 2925.03(A)(2); aggravated robbery, a first-degree felony violation of R.C. 2911.01(A)(2), with a one-year firearm specification pursuant to R.C. 2941.141; and felonious assault, a second-degree felony violation of R.C. 2903.11(A)(2).

### 7. The Examination of Anthony Lucas

{¶ 95} Anthony Lucas testified that he is employed as a police patrol officer in the city of Cleveland. On November 16, 2020, Lucas responded to Moorer's residence on Woodland Avenue in reference to a reported shooting. Moorer answered the door; he had a gunshot wound to his "right center mass abdomen." Lucas and other police officers kept pressure on the wound until emergency medical providers arrived. The paramedics took the man to the hospital.

{¶ 96} Lucas and his partner then drove to the Valero gas station where the shooting had occurred. They met with Cuyahoga Metropolitan Housing Authority police officers there. Officers identified a 9 mm cartridge case at the gas station.

{¶ 97} The state played recordings captured by Lucas's body-worn camera that evening.

{¶ 98} On cross-examination, Lucas admitted that 9 mm-caliber weapons are very common.

### 8. The Examination of Cody Sheets

{¶ 99} Cody Sheets testified that he is employed as a police sergeant in Cleveland. On December 2, 2020, Sheets was working as a patrol officer and came into contact with Church while responding to a call for service. Sheets identified Church in the courtroom.

{¶ 100} Sheets described that Church was standing outside of a Honda Element. Church was on the driver's side, speaking with the driver. Sheets activated his emergency lights. Sheets described that Church "looks at us then jumps into the backdoor, like the back driver's side door, like kind of headfirst into the backseat of the vehicle." Sheets described the movement as "almost like [a] dive, like very quick."

{¶ 101} Officers approached the vehicle, and Sheets saw that Church was in the backseat on the passenger side. The driver of the car consented to a search of the vehicle. Officers located a loaded handgun "[d]irectly underneath the seat where Mr. Church was sitting."

{¶ 102} The handgun was a "black Ruger American 9 millimeter handgun."[1]

{¶ 103} At the time of this encounter with police, Church was wearing a black-hooded sweatshirt with a gray zipper.

{¶ 104} On cross-examination, Sheets admitted that the driver of the vehicle was identified as the mother of Church's child and that their child was asleep on the driver's side rear seat when officers approached the vehicle. He further admitted that the firearm was placed into a plastic bag, which he later learned "kind of ruins it" for purposes of being able to extract DNA or fingerprints from the item.

### 9. The Examination of Odilio Gonzalez

{¶ 105} Odilio Gonzalez testified that he is employed as a phone technician by Securus Technologies, a company that provides technology and services to the Cuyahoga County Corrections Center for detainees to make calls from the jail.

{¶ 106} Gonzalez identified a Securus call detail report that recorded that Church dialed a certain phone number associated with a person named Yasmeen Woods while detailed at the jail. The log recorded 937 completed calls between Church and Woods's phone number.

{¶ 107} On cross-examination, Gonzalez admitted that the call records indicated that every single one of Church's calls to that number had been reviewed by law enforcement.

---

[1] As a result of this encounter, federal prosecutors obtained an indictment charging Church with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1) and 924(a)(2). A jury acquitted him. Jury Verdict, *United States v. Temarcus Church*, 1:21 CR 0079 (N.D. Ohio Sept. 15, 2022).

## 10. The Examination of Ashley Jaycox

{¶ 108} Ashley Jaycox testified that she is employed as a police sergeant in the detective bureau of the Cuyahoga Metropolitan Housing Authority Police Department. Jaycox said she is familiar with Church, since the two have had "five or six" interactions lasting between five minutes and an hour.

{¶ 109} Jaycox identified Church in the courtroom.

{¶ 110} Shortly after the shooting, another detective showed Jaycox a still photograph from a security camera inside the Valero gas station, taken at 11:18 p.m. on the night of the shooting. The photograph focuses on two individuals, one standing at the counter and the other standing just behind the first. Jaycox told the other detective that she thought the second individual was Church, but she was not positive.

{¶ 111} Several months before trial, Jaycox reviewed the video itself and identified that the individual has a distinctive "gait" that she recognized as Church's gait.

{¶ 112} On cross-examination, Jaycox described that Church is "a dark-skinned black male" with an "average" build; he is not slim.

## 11. The Examination of Edward Lattyak

{¶ 113} Edward Lattyak testified that he is employed as the firearm section supervisor in the Cuyahoga County Regional Forensic Science Laboratory. Church stipulated that Lattyak is an expert in firearm and tool mark examination.

{¶ 114} Lattyak examined the firearm that police found under Church's seat on December 2, 2020. He test fired the weapon and compared the test-fired cartridge cases with the cartridge case found at the Valero gas station after the shooting on November 16, 2020.

{¶ 115} Based on his examination, he concluded that the gun found under Church's seat fired the cartridge case that was found at the Valero gas station.

{¶ 116} On cross-examination, Lattyak admitted that firearms, cartridge cases, and bullets can be tested for fingerprints and DNA. Lattyak further admitted that the firearm was a Ruger brand. Glock is a different manufacturer of firearms. Lattyak further admitted that his examination would not allow him to estimate when the cartridge case at the gas station was fired.

### 12. The Examination of Robert Gilbert

{¶ 117} Robert Gilbert testified that he is employed as a paralegal by Fiserv Incorporated; he works in that organization's "subpoena response team for the legal department." Fiserv Incorporated processes the credit-card transactions for the Valero gas station on Woodland Avenue.

{¶ 118} In 2020, Gilbert assisted Fiserv Incorporated with responding to a subpoena requesting transaction records for a payment-card transaction at the Valero gas station on Woodland Avenue. Gilbert identified that there had been a card transaction at 10:20 p.m. that evening, made with a card ending in -4367.

### 13. The Examination of Kristi Brock

{¶ 119} Kristi Brock testified that she is employed as a "subpoena analyst team lead" at Banc Corp Bank. Among other business lines, Banc Corp issues prepaid debit cards for certain companies.

{¶ 120} Brock assisted Banc Corp Bank in responding to a subpoena requesting card information related to certain card transactions at the Valero gas station. The cardholder for the card ending in -4367 was identified as Yasmeen Woods.

### 14. The Examination of Owen Norman

{¶ 121} Owen Norman testified that he is employed as a police detective in Cleveland. In November 2020, he was serving as a detective in the "violent crime response team." He responded to the Valero gas station on the night of the shooting as an evidence technician processed the scene and collected the cartridge case. Norman then drove to the hospital and interviewed Moorer. Norman then contacted the manager of the Valero and obtained surveillance footage of the shooting.

{¶ 122} The surveillance video records that two men arrived to the gas station in a black vehicle and parked at a pump. The two men walked into the store together. One of the men used a credit-card machine while the other stood next to him. The two men left the store together. Norman testified as follows about the video:

> "[A]s the two males walked away, I observed that the male in the blue jeans, the heavier set black male, when he turned there appeared to be a firearm either handle or magazine that was sticking out from the right side of his waistband area."

{¶ 123} Norman testified that he thought he saw the firearm on the surveillance video from outside the store as well.

{¶ 124} The two men got back into the same car in which they arrived. The person police identified as Church entered the vehicle on the passenger side. The vehicle then circled around the gas pumps, parking in front of the store.

{¶ 125} Moorer then parked his vehicle. Moorer entered the store. While he walked to the store, the black vehicle pulled around to the side of the store, out of sight of the camera. Moorer completed his purchase and then walked out to his vehicle. As he walked to his car, a male ran up to him and robbed him and shot him and then ran out of sight in the direction where the black car had driven. A vehicle then pulled out of the parking lot at a high rate of speed.

{¶ 126} On cross-examination, Norman admitted that the black vehicle pulled out of view of the surveillance camera "briefly" before pulling around to the pumps. Norman further admitted that Moorer told him he only saw one person in the car. Norman further admitted that at no point in the surveillance video does the camera record Church driving the vehicle.

{¶ 127} The defense presented Norman with an affidavit he executed, which was submitted to secure a search warrant in this case. Norman averred that, when he watched the surveillance footage, he observed that "[w]hile the suspect was shooting, I noticed another male who was participating by awaiting as the getaway driver for the suspect." Norman admitted that that statement was based on the fact

that he saw two people get into the car together, even though Church was never seen in the driver's seat.

{¶ 128} Norman averred that the surveillance video showed "that the getaway driver was waiting for the suspect to return before fleeing at a high rate of speed out of the parking lot and eastbound onto Woodland." Norman admitted that he cannot be sure that the car in the video, seen exiting the parking lot at a high rate of speed, was the same vehicle the shooter had been driving earlier in the footage.

{¶ 129} Norman averred that Moorer told him that "as he was pulling into the area near the first gas pump to park his vehicle, that he was being observed by two black males * * *."

### 15. The Verdict

{¶ 130} Church moved for acquittal on all charges pursuant to Crim.R. 29 after the state rested. The state conceded that Church was not the shooter, but argued that Church aided and abetted the Shooter, or acted in complicity with the Shooter. The court denied the motion.

{¶ 131} The defense rested without presenting witnesses. Church renewed his Crim.R. 29 motion after the close of evidence, and the court denied the motion.

{¶ 132} On October 24, 2022, the jury returned its verdicts. The jury found Church guilty of attempted murder, two counts of aggravated robbery, and two counts of felonious assault, as well as all the specifications attached to those counts. The jury acquitted Church on two counts of having weapons while under disability.

## C. The Sentencing Hearing, First Appeal, and Resentencing

{¶ 133} The trial court held a sentencing hearing in both cases on December 6, 2022.

{¶ 134} The state and the defense addressed the court regarding the sentence to be imposed, as did Church.

{¶ 135} In Cuyahoga C.P. No. CR-21-665390, Church stood convicted of Counts 3 and 4 (two counts of having weapons while under disability, each a third-degree felony, with one-year, 18-month, 3-year, and 54-month firearm specifications) and Count 6 (carrying concealed weapons, a fourth-degree felony). The parties agreed with each other that Counts 3 and 4 should merge and that all the firearm specifications should merge as well.

{¶ 136} The court announced a sentence of 18 months as to Count 3, to be served after and consecutive to 54 months on the accompanying firearm specification. The trial court did not specifically address Count 4 or the issue of merger at the hearing and announced that the "specifications will be served concurrent with each other," suggesting that it was contemplating imposing sentence on each of Counts 3–4. The trial court failed to impose any sentence on Count 6.

{¶ 137} In Cuyahoga C.P. No. CR-21-665502, Church stood convicted of attempted murder, two counts of aggravated robbery and two counts of felonious assault, as well as all the specifications attached to those counts.

{¶ 138} As to the offense of attempted murder (Count 1), Church was sentenced to a 54-month prison term for the firearm specification, to be served prior and consecutive to an indefinite sentence consisting of a minimum of five years and a maximum of seven and one-half years in prison for the underlying felony. As to aggravated robbery (Count 3), Church was sentenced to a 54-month prison term for the firearm specification, to be served prior and consecutive to a five-year prison term for the underlying felony. As to felonious assault (Count 5), Church was sentenced to a 54-month prison term for the firearm specification, to be served prior and consecutive to a five-year prison term for the underlying felony.

{¶ 139} The court ran two 54-month mandatory prison terms consecutively to each other and to the firearm-specification sentences in Cuyahoga C.P. No. CR-21-665390. The court ran all the other sentences concurrently with the indefinite 5.0- to 7.5-year sentence on the underlying felony in Count 1. Church received 724 days of jail-time credit.

{¶ 140} Church filed an appeal from the sentencing entries in both cases, but this court dismissed the appeal from Cuyahoga C.P. No. CR-21-665390 for lack of a final, appealable order as a result of the deficiencies identified above in paragraph 137. *State v. Church*, 8th Dist. Cuyahoga No. 112296, Motion No. 565524 (June 27, 2023).

{¶ 141} The trial court held a resentencing hearing in Cuyahoga C.P. No. CR-21-665390 on July 13, 2023. The trial court found that Count 4 merged with

Count 3. The trial court, over the state's objection, also found that Count 6 merged with Count 3. The state elected to proceed to sentencing on Count 3.

{¶ 142} The court then imposed a sentence of 18 months in prison on the underlying felony for Count 3, to be served after and consecutive to a sentence of 54 months in prison on the accompanying firearm specification.

{¶ 143} The court issued a sentencing journal entry, erroneously failing to delete the following sentence:

> Count 4, 18 months plus an additional 54 months on the firearm specification to be served prior to and consecutive to the underlying charge.

{¶ 144} The journal entry also erroneously refers to multiple charges in the following sentence:

> Underlying charges to run concurrent to each other an[d] concurrent to case number 665502.

{¶ 145} A review of the record clearly shows that these statements are clerical errors. The trial court specifically merged Counts 4 and 6 into Count 3 at the resentencing hearing; it did not impose any sentence on Count 4 or Count 6. The court seems to have then copied most of the language from its original sentencing entry without making the appropriate edits to the two sentences described above. This court will remand this matter for the trial court to correct these errors through a nunc pro tunc entry.

{¶ 146} Taken together, the two cases amount to a minimum aggregate sentence of 18.5 years in prison, up to a maximum of 21 years.[2]

{¶ 147} After the resentencing hearing, Church refiled his appeal in Cuyahoga C.P. No. CR-21-665390, raising the following two assignments of error:

FIRST ASSIGNMENT OF ERROR

Defendant-appellant's conviction must be reversed due to improperly admitted hearsay statements which were testimonial.

SECOND ASSIGNMENT OF ERROR

The guilty verdict of felony carrying a concealed weapon was not supported by sufficient evidence.

{¶ 148} This court consolidated that appeal with Church's appeal from Cuyahoga C.P. No. CR-21-665502, which raised the following assignments of error for review:

THIRD ASSIGNMENT OF ERROR

The convictions must be reversed due to prosecutorial misconduct.

FOURTH ASSIGNMENT OF ERROR

The convictions were not supported by sufficient evidence.

FIFTH ASSIGNMENT OF ERROR

The convictions were against the manifest weight of the evidence.

---

[2] Church will serve four and one-half years for the firearm specification in Cuyahoga C.P. No. CR-21-665390, followed by nine years for the firearm specifications attached to Counts 1 and 2 in Cuyahoga C.P. No. CR-21-665502, followed by an indefinite sentence off five to seven and one-half years for the underlying felony in Count 1 of Cuyahoga C.P. No. CR-21-665502. The remaining sentences will be served concurrently to that indefinite sentence after the completion of all the firearm terms.

SIXTH ASSIGNMENT OF ERROR

Defendant-appellant did not receive effective assistance of counsel.

SEVENTH ASSIGNMENT OF ERROR

The trial court erred by failing to merge Count One with Count Five.

EIGHTH ASSIGNMENT OF ERROR

The indeterminate sentence in Count One must be reversed as the Reagan Tokes Law is unconstitutional.

## II. Law and Analysis

### A. First Assignment of Error — Hearsay and Confrontation Clause

{¶ 149} Church contends that his conviction for having weapons while under disability in Cuyahoga C.P. No. CR-21-665390 should be vacated because, he says, inadmissible hearsay was admitted in violation of the Ohio Rules of Evidence and in derogation of his right to confront the state's witnesses. Church points to two categories of evidence that he says violated his rights and were inadmissible hearsay.

{¶ 150} First, he complains that the trial court permitted Officer Angelino to say that, as he responded to Selzer Avenue in response to 9-1-1 calls for shots fired, he saw multiple people outside and those people "were saying that * * * there was a male outside shooting a gun." Church concedes that this testimony did not violate his right to confront witnesses, but he maintains that it is inadmissible hearsay.

{¶ 151} Second, Church complains that the state introduced certain statements made by Dina Turner to police at the scene on the highway, despite not calling Turner as a witness in its case-in-chief. He contends that doing so violated

his confrontation-clause rights.  Specifically, Church identifies the following aspects

of the trial testimony as violating his rights:

- Officer Angelino testified that officers from the Third District told him that Turner had flagged them down and claimed that "her child's father shot at her over in the area of 25th and Denison."

- Officer Angelino testified that he interviewed Turner at the scene and Turner "said she was in the area of * * * 23rd and Selzer to pick up her son when she was followed by the suspect.  And that he was standing outside the car, shot at her, and they took off, like trying to get away from them, and that's when they ended up on the highway after they flagged down an officer."

- Officer Angelino testified that Turner indicated to him that she was shot at by an individual in a white car.

- Officer Vazquez testified that Turner indicated to officers that she had been shot at.

- Officer Cardona testified that Turner, when flagging them down, said the occupants of another vehicle had guns and were shooting at her.

- Officer Sanchez testified that Turner, when flagging them down, said, "They were shooting at me, and they're right there.  They were shooting at me."

- Officer Sanchez testified that he talked to Turner again after detaining Church, and Turner told him that the shooting occurred "somewhere in the West 25th and Denison area."

{¶ 152} We begin our analysis with a consideration of Officer Angelino's testimony about the neighbors on Selzer Avenue, because Church does not contend that that testimony violated his constitutional rights.

{¶ 153} "A trial court has broad discretion regarding the admission of evidence, including whether evidence constitutes hearsay and whether it is admissible hearsay." *State v. Wingfield*, 2019-Ohio-1644, ¶ 29 (8th Dist.), citing *Solon v. Woods,* 2014-Ohio-5425, ¶ 10 (8th Dist.). "We therefore will not disturb a trial court's decision regarding the admissibility of hearsay evidence absent an abuse of discretion and the defendant suffers material prejudice." *Wingfield* at ¶ 29, citing *Woods*, citing *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

{¶ 154} An "abuse of discretion" occurs where "a court exercise[s] its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. No court has discretionary authority to apply the law incorrectly, which is why courts apply a de novo standard when reviewing issues of law. *Id.* at ¶ 38, citing *Hudson v. Petrosurance, Inc.*, 2010-Ohio-4505, ¶ 30; *State v. Boles*, 2010-Ohio-278, ¶ 26 (2d Dist.).

{¶ 155} "Hearsay is 'a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.'" *Wingfield* at ¶ 30, quoting Evid.R. 801(C). "If either element is missing — (1) a statement or (2) offered for its truth — the testimony is not hearsay."

*Wingfield* at ¶ 30, citing *State v. Holt*, 1999 Ohio App. LEXIS 4149, *8 (9th Dist. Sept. 8, 1996).

{¶ 156} Officer Angelino's testimony about what the neighbors told him when he arrived on the Selzer Avenue scene was not offered to prove the truth of the matter asserted. It was presented to establish the officer's investigation of the events and individuals involved in the shooting. Therefore, the testimony was not hearsay. *State v. Henderson*, 2007-Ohio-2372, ¶ 45 (8th Dist.); *see also State v. Dakdouk*, 2001 Ohio App. LEXIS 741 (8th Dist. Mar. 1, 2001) (court held that the admission of a detective's testimony about an anonymous tip was not inadmissible hearsay evidence because it was not offered to prove the truth of the matter asserted, but rather to merely establish the detective's reason for investigating the appellant); *State v. Carpenter*, 2006-Ohio-4296, ¶ 15 (6th Dist.) ("When a statement is offered into evidence to explain the conduct of a police officer's investigation of a crime, it is not considered to be hearsay."); *State v. Craft*, 2007-Ohio-4116, ¶ 51 (12th Dist.) ("Where a statement made by an individual to a law enforcement officer is offered to prove the officer's subsequent investigative activities, the statement does not constitute hearsay and is properly admissible.").

{¶ 157} Having determined that the trial court did not abuse its discretion by allowing Officer Angelino to testify as to what the Selzer Avenue neighbors reported after the shooting, we turn to a consideration of whether Church's rights were violated by the introduction of Turner's statements at the highway scene through officer testimony and body-camera recordings.

{¶ 158} The Sixth Amendment to the United States Constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him [or her]."

> "With respect to hearsay, the United States Supreme Court has held that the Confrontation Clause prohibits the admission of a testimonial, out-of-court statement made by a witness unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness."

*State v. Baird*, 2023-Ohio-303, ¶ 47 (8th Dist.), quoting *Craft* at ¶ 50, citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

{¶ 159} The state contends that Turner's statements to police on the side of the highway were nontestimonial and were excited utterances made to secure police assistance for an ongoing emergency — being shot at and chased by Church. The state points out that the police officers described Turner as "frantic," waving her arms and yelling to get their attention. She remained visibly upset for the duration of her conversations with police on the side of the congested highway.

{¶ 160} "'We review evidentiary rulings that implicate the Confrontation Clause de novo.'" *State v. Jones*, 2022-Ohio-1936, ¶ 24 (8th Dist.), citing *State v. McKelton*, 2016-Ohio-5735, ¶ 97.

{¶ 161} This court has described a defendant's confrontation rights as follows:

> In *Crawford*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177, the United States Supreme Court held that the Confrontation Clause of the Sixth Amendment to the United States Constitution permits testimonial statements of witnesses absent from trial where the declarant is unavailable, only where the defendant has had a prior

opportunity to cross-examine. Testimonial statements include statements "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52. *See also Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency." *Davis* at 823. *See also State v. Eicholtz*, 2d Dist. Clark No. 2012-CA-7, 2013-Ohio-302, ¶ 26.

*Cleveland v. Taylor*, 2021-Ohio-584, ¶ 50 (8th Dist.), quoting *State v. Renode,* 2020-Ohio-5430, ¶ 24 (8th Dist.).

{¶ 162} "An excited utterance is defined as a 'statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'" *State v. Carstaphen*, 2022-Ohio-3129, ¶ 32 (8th Dist.), quoting Evid.R. 803(2). Turner's initial statements to police, while she was flagging them down, were clearly excited utterances made to secure police assistance to respond to an ongoing emergency.

"Evid.R. 803 sets forth certain exceptions to the rule against hearsay, including the 'excited utterance' exception. Evid.R. 803(2). In order for a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (a) the occurrence of an event startling enough to produce a nervous excitement in the declarant that stills his reflexive faculties so that his declarations are spontaneous and the unreflective and sincere expressions of his impressions and beliefs; (b) a statement made while still under the stress of excitement caused by the event; (c) a statement related to the startling event; and (d) the declarant had an opportunity to personally observe the matters in his declaration. *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993); *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 166."

*Taylor* at ¶ 53, quoting *Renode* at ¶ 27.

{¶ 163} Here, Turner's initial statements to police were made frantically during the course of a startling event — being shot at and chased by Church — and were primarily intended to obtain police assistance. All four of the prerequisites were met. In other words, they were nontestimonial and admissible as excited utterances. Police officers from the Third District repeated Turner's initial statements to the testifying officers, but the statements from the Third District police were not hearsay because they were offered not for the truth of the matter asserted but rather to establish the officer's investigation of the events and individuals involved in the shooting. *E.g.*, *Henderson*, 2007-Ohio-2372, at ¶ 45 (8th Dist.).

{¶ 164} The statements Turner made to police after Church was detained present a closer call. After police detained Church, they interviewed Turner on the side of the highway about the events of the evening. This interview led to Turner providing a more detailed narrative of events: she "was in the area of * * * 23rd and Selzer to pick up her son when she was followed by the suspect. And that he was standing outside the car, shot at her, and they took off, like trying to get away from them, and that's when they ended up on the highway after they flagged down an officer."

{¶ 165} While Church had been detained when these statements were made, "[t]he Supreme Court has made clear that, to be an excited utterance, the statement need not be strictly contemporaneous with the startling event." *Carstaphen*, 2022-Ohio-3129, at ¶ 35 (8th Dist.), citing *State v. Duncan*, 53 Ohio St.2d 215 (1978),

paragraph one of the syllabus. """[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.""" *Carstaphen* at ¶ 35, quoting *Duncan* at 219; *see also In re C.C.*, 2007-Ohio-2226 (8th Dist.) (finding an excited utterance even though 27 days passed between the event and the statement); *State v. Duke*, 1988 Ohio App. LEXIS 3466 (8th Dist. Aug. 25, 1988) (finding an excited utterance when the statement was made ten days following an incident).

{¶ 166} After careful consideration, we conclude that the circumstances of the interview objectively indicate that the primary purpose of the interview was to enable police assistance to meet an ongoing emergency, including ascertaining the location of the shooting Turner was reporting (where more additional emergency assistance may have been needed). Moreover, Turner made these statements while still under the stress and excitement of being shot at and chased, and having to flag down police officers on the side of a congested highway. Thus, the trial court did not err or abuse its discretion in allowing the police officers to testify about statements Turner made to them at the highway scene.

{¶ 167} As there was no violation of Church's Confrontation Clause rights, and because the trial court did not abuse its discretion in allowing the police to testify to the challenged statements of Turner and the neighbors on Selzer Avenue, the first assignment of error is overruled.

## B. Second Assignment of Error — Sufficiency of the Evidence

{¶ 168} Church contends that there was insufficient evidence to support the jury's finding of guilt for felony carrying a concealed weapon in Cuyahoga C.P. No. CR-21-665390 (the March 2020 shooting case). He implicitly acknowledges that there was sufficient evidence for the jury to find him guilty of a misdemeanor violation of R.C. 2923.12(A), but he says the jury could not have found him guilty of a felony violation. *See* R.C. 2923.12(F)(1) (the offense is a felony when, as relevant here, the offender previously has been convicted of an offense of violence and the weapon involved is a firearm that "is either loaded or for which the offender has ammunition ready at hand"). The state concedes "that the felony conviction [for] carrying a concealed weapon should be reduced to a misdemeanor * * *."

{¶ 169} Any error with respect to the jury's finding of guilt on this charge is harmless. Moreover, because the carrying-concealed-weapon offense merged into another offense at sentencing, there is no conviction for us to reduce. *See State v. Whitfield*, 2010-Ohio-2, ¶ 24 ("A 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty.").

{¶ 170} At the resentencing hearing, the trial court merged Count 6 (felony carrying a concealed weapon) into Count 3 (having weapons while under disability). As this court has recognized:

> When counts in an indictment are allied offenses that are merged for the purposes of sentencing, the reviewing court need not consider the sufficiency or the weight of the evidence thereon because any error relating to those counts would be harmless. *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, citing *State v. Powell*, 49 Ohio St.3d 255, 263, 552 N.E.2d 191 (1990); *State v. Tegarty*, 8th Dist.

Cuyahoga No. 111855, 2023-Ohio-1369, ¶ 36, citing *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 25 (considering the sufficiency-of-the-evidence challenge only on those convictions surviving merger), and *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 138 (merger of kidnapping count with aggravated-robbery and aggravated-burglary counts moots sufficiency-of-the-evidence claim regarding kidnapping count); *see also State v. Johnson*, 8th Dist. Cuyahoga No. 111618, 2023-Ohio-1367, ¶ 116. This rationale applies to both sufficiency and manifest weight challenges. *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23.

*State v. Harder*, 2023-Ohio-2384, ¶ 25 (8th Dist.).

{¶ 171} Because Count 6 merged into Count 3 at sentencing, any error with respect to the jury's finding of guilt on Count 6 is harmless.

{¶ 172} We, therefore, overrule Church's second assignment of error.

## C.  Third Assignment of Error — Prosecutorial Misconduct

{¶ 173} Church contends that the state committed prosecutorial misconduct in its closing argument at trial in Cuyahoga C.P. No. CR-21-665502-A (the November 2020 shooting).

{¶ 174} An appellate court reviews an allegation of prosecutorial misconduct during closing arguments by asking "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. McAlpin*, 2022-Ohio-1567, ¶ 156, quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "'[T]he touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."'" *Id.*, quoting *State v. Leonard*, 2004-Ohio-6235, ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 175} Here, the parties disputed whether surveillance footage from inside the gas station recorded Church carrying a firearm in his waistband. The defense suggested at closing argument that the object one of the officers identified as a gun in the video may actually be a cell phone. The state, in its closing argument, argued the following:

> By the way, you heard the detective testify he believes that's a gun. Folks, Detective Norman's been a police officer for a number of years and a detective. I trust his judgment on what is [a] gun and what isn't. I don't know what, you know, a phone case?

{¶ 176} Defense counsel objected, and the trial court overruled the objection. On appeal, Church argues that the prosecutor improperly personally vouched for the credibility of a state witness. Church argues that the remarks prejudiced him because a "central issue" of the case was whether Church gave the Shooter the firearm used in the shooting.

{¶ 177} "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v. Williams*, 79 Ohio St.3d 1, 12 (1997).

{¶ 178} We agree that the prosecutor's statement that he "trusts [the detective's] judgment" about the object depicted in the surveillance video was improper. The prosecutor personally vouched for Norman's testimony. However, we cannot see how the absence of this remark would have changed the jury's determination given the larger context of the trial and the evidence presented by the prosecution. The comment was isolated, and the trial court noted to the jury that

the state's closing argument was not evidence. Additionally, the prosecutor reminded the jury that it was the jury's duty to determine the credibility of witnesses.

{¶ 179} We note that there has been no complaint that the trial court failed to properly instruct the jury. Further, the jury was able to review the video itself and determine whether the item in Church's waistband was a firearm or some other object. Finally, we note that forensic testing revealed that a firearm later found under Church's seat in a vehicle was the firearm that fired the cartridge case found at the location of the shooting.

{¶ 180} Church also objects to the following statement made at closing argument:

> Again, your common sense is what we want, Ladies and Gentlemen. And you'll have the journal entries which reflect his past, specifically that he's been previously convicted of aggravated robbery and having weapons under disability is a charge here, with a firearm specification there.

{¶ 181} He contends that the prosecutor's reference to "common sense" immediately before discussing Church's previous convictions improperly suggested that the prior convictions were evidence of Church's bad character. *See State v. Walker*, 2022-Ohio-1238, ¶ 43–49 (8th Dist.); *State v. Goines*, 111 Ohio App.3d 840, 845–847, (8th Dist. 1996).

{¶ 182} As Church did not object to that statement during argument, he has waived all but plain error. *E.g., State v. Shropshire*, 2017-Ohio-8308, ¶ 47 (8th Dist.); *McAlpin*, 2022-Ohio-1567, at ¶ 314.

{¶ 183} In pulling this quotation from the state's closing argument, Church leaves out important context. Immediately before saying this, the prosecutor argued that any doubt that Church was the person in the gas station that day would be unreasonable doubt:

> And again, Ladies and Gentlemen, your common sense is what we want. Again, hundreds of thousands of people in the City of Cleveland. Only one shell casing found at the scene. It matches the gun that was with him two weeks later. * * * What are the odds of that? Think about that. Hundreds of thousands of people in the City of Cleveland, he just happens to know the girl whose card was just used [in the gas station]?

{¶ 184} In context, the prosecutor's comment about common sense is logically understood as closing the loop on his argument that common sense supports a conclusion that Church was the person with the shooter at the gas station. "[I]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Shropshire* at ¶ 45, citing *State v. Hill*, 75 Ohio St.3d 195, 204 (1996).

{¶ 185} Accordingly, no plain error occurred with respect to this comment about common sense.

{¶ 186} Having reviewed the prosecutor's closing argument in its entirety within the context of the entire trial, we cannot say that the argument was improper to the extent that it permeated the entire atmosphere of the trial, such that it would necessitate a finding that the trial itself was unfair.

{¶ 187} We overrule Church's third assignment of error.

## D. Fourth and Fifth Assignments of Error — Sufficiency and Manifest Weight of the Evidence

{¶ 188} Church contends that the evidence was not sufficient to support a finding that he was complicit in these crimes and, further, that his convictions were against the manifest weight of the evidence.

{¶ 189} "Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense." *State v. Hoskin-Hudson*, 2016-Ohio-5410, ¶ 7 (8th Dist.). "[A]n appellate court reviews a trial court's denial of a defendant's motion for acquittal using the same standard it applies when reviewing a sufficiency-of-the-evidence claim." *Hoskin-Hudson* at ¶ 7.

{¶ 190} "'Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.'" *McFarland*, 2020-Ohio-3343, at ¶ 23, quoting *State v. Smith*, 80 Ohio St.3d 89, 113 (1997).

{¶ 191} "'[W]hen reviewing the sufficiency of the evidence to support a criminal conviction'" the function of an appellate court "'is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id*. at ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in Smith* at 102, fn. 4.

{¶ 192} "'[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), followed.)'" *McFarland* at ¶ 24, quoting *Jenks* at paragraph two of the syllabus.

{¶ 193} In contrast to an appellate court's sufficiency of the evidence inquiry of whether the state met its burden of production at trial, a manifest weight of the evidence inquiry asks whether the state met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

{¶ 194} In conducting a manifest weight inquiry, a reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist. 1983). An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances where the evidence presented at trial weighs heavily against the conviction. *Thompkins* at 388.

{¶ 195} A person commits attempted murder in violation of R.C. 2923.02 and 2903.02(A) by attempting to purposely cause the death of another.

{¶ 196} A person commits aggravated robbery in violation of R.C. 2911.01(A)(1) by (1) having a deadly weapon on or about their person or under

their control and (2) either displaying the weapon, brandishing it, indicating that they possess it, or using it (3) in attempting or committing a theft offense.

{¶ 197} A person commits felonious assault in violation of R.C. 2903.11(A)(1) by knowingly causing serious physical harm to another.

{¶ 198} Under many circumstances, a trial court is required to impose a mandatory 54-month prison term on an offender under R.C. 2929.14(B)(1)(a)(v) if the offender (1) had a firearm on or about their person or under their control while committing the offense and (2) displayed the firearm, brandished the firearm, indicated that they possessed a firearm, or used the firearm to facilitate the offense, when the offender (3) previously had been convicted of or pleaded guilty to an enumerated firearm specification. R.C. 2941.145(D).

{¶ 199} Here, Church concedes that there was sufficient evidence presented, as to all charges, to "convict the individual who actually robbed and shot the victim." But Church argues that there was insufficient evidence presented to support a finding that he was complicit in the offenses.

{¶ 200} A person is guilty of an offense by complicity when, acting with the kind of culpability required for the commission of an offense, they (1) solicit or procure another to commit the offense, (2) aid or abet another in committing the offense, (3) conspire with another to commit the offense, or (4) cause an innocent or irresponsible person to commit the offense. R.C. 2923.03(A).

{¶ 201} "[C]onviction of the principal offender is not a prerequisite to finding a defendant guilty of complicity." *State v. Gardner*, 2023-Ohio-307, ¶ 34 (8th

Dist.), citing R.C. 2923.03(B) ("It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender."). The state is not required to establish the principal's identity to convict an offender of complicity, but only that the state proves that a principal committed the offense. *Id.*, citing R.C. 2923.03(C) and *State v. Perryman*, 49 Ohio St.2d 14 (1976), paragraph four of the syllabus, *vacated on other grounds, sub nom.*, *Strodes v. Ohio*, 438 U.S. 911 (1978). But "[m]ere association with the principal offender * * * is insufficient to establish complicity." *State v. Hoston*, 2015-Ohio-5422, ¶ 13 (8th Dist.), citing *State v. Doumbas*, 2015-Ohio-3026 (8th Dist.).

{¶ 202} Here, a police officer familiar with Church identified him as the person who arrived to the gas station with the Shooter, accompanied the Shooter into the store, left with the Shooter, and reentered the same vehicle as the Shooter. Credit-card records and jail-call records support a conclusion that Church was the person who accompanied the Shooter that day. There was an object visible at Church's waist on the surveillance video that could be consistent with the shape of a firearm. While the vehicle left the view of the camera before the robbery, there is no reason to believe that it left the station entirely when the Shooter quickly returned into view in order to rob Moorer. There is no dispute that the Shooter committed the offenses charged, because the Shooter robbed and shot Moorer. The Shooter then quickly left the view of the camera in the direction where the vehicle had been headed minutes before. Forensic tests later determined that a firearm located in the area of Church's person fired the cartridge case recovered from the scene of the

shooting, showing that Church voluntarily continued carrying the firearm even after the Shooter used it to shoot Moorer.

{¶ 203} We find that this evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Church was not a mere bystander to the Shooter's actions but rather solicited, aided, abetted, or conspired with the Shooter in committing these crimes. *Compare State v. Rice*, 2021-Ohio-1882, ¶ 30–33 (8th Dist.).

{¶ 204} In reviewing the record, we noted several inconsistencies in the state's evidence. Most notably, Moorer testified that he only saw one person "mean-mugging" him; he did not see anyone else in the vehicle. Church pointed out those inconsistencies to the jury, also noting inconsistencies between the state's case and Detective Norman's affidavit.

{¶ 205} In looking at the record as a whole, though, and considering the complicity statute, we cannot say that the convictions were against the manifest weight of the evidence. A defendant is not entitled to reversal merely because certain aspects of witness testimony are inconsistent or contradictory. *E.g.*, *State v. Wade*, 2008-Ohio-4574, ¶ 38 (8th Dist.) ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 2005-Ohio-4547, ¶ 11 (10th Dist.); *State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.) ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render [a] defendant's conviction against the manifest weight or sufficiency

of the evidence.'"), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245 (10th Dist. May 28, 1996).

**{¶ 206}** Church argued his case to the jury, highlighting the inconsistencies he saw in the state's case and identifying the limitations of the surveillance video entered into evidence. The jury was free to reject any portion of the state's evidence that was inconsistent or otherwise unbelievable. The fact that it acquitted Church on two counts of having weapons while under disability shows that it did not accept the state's theory of the case wholesale.

**{¶ 207}** After a thorough review of the record, we cannot say that this is an exceptional case where the trier of fact clearly lost its way and created a manifest miscarriage of justice such that a conviction must be reversed.

**{¶ 208}** We, therefore, overrule Church's fourth and fifth assignments of error.

### E. Sixth Assignment of Error — Ineffective Assistance of Counsel

**{¶ 209}** Church admits that his trial counsel "vigorously represented" him "and presented an effective defense in most respects." But he claims that his counsel made two errors that require reversal for a new trial: (1) counsel failed to object to the prosecutor's reference to Church's prior record during closing argument and (2) counsel failed to request a limiting instruction with respect to Church's prior criminal history.

> To succeed on a claim of ineffective assistance, a defendant must establish that counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v.*

*Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Prejudice is established if the defendant proves the existence of a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *Bradley* at 143. In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Strickland* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 69.

*State v. Sowell*, 2020-Ohio-2938, ¶ 40 (8th Dist.).

{¶ 210} Both of these arguments follow on to Church's third assignment of error, in which he argued that the prosecutor improperly cast Church's prior convictions as evidence of his bad character. His first argument flows directly from his belief that the prosecutor's argument was objectionable. As to his second argument, Church concedes that counsel's decision not to request a limiting instruction as to the prior convictions "could be a strategic decision to not allow the jury to focus additional attention to it," but in light of the objectionable statement made by the prosecutor his counsel should have requested the instruction.

{¶ 211} Both arguments suffer from the same fatal defect: when reading the state's closing argument as a whole, it is clear that the prosecutor was not making any improper argument with respect to the prior convictions. Church appropriately concedes that, because of the nature of the charges, it was appropriate for the state to remind the jury that Church had these prior convictions. And as further discussed above, the state's appeal to the jury's common sense was logically connected to the

arguments that immediately preceded it, namely that common sense counsels against a conclusion that Church was not the person in the gas station that night.

{¶ 212} Church's sixth assignment of error is overruled.

### F. Seventh Assignment of Error — Allied Offenses and Merger

{¶ 213} Church contends that it was plain error for the trial court to fail to merge the offense of attempted murder with the offense of felonious assault for sentencing in Cuyahoga C.P. No. CR-21-665502-A.

> "[A] reviewing court's analysis is generally limited to reviewing issues raised on appeal solely for plain error or defects affecting a defendant's substantial rights pursuant to Crim.R. 52(B). *State v. Tisdale*, 8th Dist. Cuyahoga No. 74331, 1998 Ohio App. LEXIS 6143 (Dec. 17, 1988). The plain error doctrine should be invoked by an appellate court only in exceptional circumstances to prevent a miscarriage of justice. *State v. Cooperrider*, 4 Ohio St.3d 226, 227, 448 N.E.2d 452 (1983). Plain error will be recognized only where, but for the error, the outcome of the case would clearly have been different. *Id.*"

*State v. Bell*, 2019-Ohio-340, ¶ 61 (8th Dist.), quoting *State v. King*, 2009-Ohio-4551, ¶ 8 (8th Dist.).

{¶ 214} The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution, and the Ohio Constitution, art. I, § 10, protect a defendant against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *State v. Martello*, 2002-Ohio-6661, ¶ 7; *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Anthony* at ¶ 15. R.C. 2941.25 codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10, art. I of the Ohio Constitution, prohibiting multiple

punishments for the same offense. *State v. McCarty*, 2015-Ohio-4695, ¶ 13 (8th Dist.).

{¶ 215} While

> [u]nder R.C. 2941.25, Ohio's multicount statute, where the defendant's conduct constitutes two or more allied offenses of similar import, the defendant may be convicted of only one offense. R.C. 2941.25(A). A defendant charged with multiple offenses may be convicted of all the offenses, however, if (1) the defendant's conduct constitutes offenses of dissimilar import, i.e., each offense caused separate identifiable harm; (2) the offenses were committed separately; or (3) the offenses were committed with separate animus or motivation. R.C. 2941.25(B); *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 13. Thus, to determine whether offenses are allied, courts must consider the defendant's conduct, the animus, and the import. *Id.* at paragraph one of the syllabus.

*State v. Clarke*, 2017-Ohio-8226, ¶ 26 (8th Dist.).

{¶ 216} The state concedes the merger error on appeal and the error is supported by the record. The two offenses involve the same victim, were committed with a single animus, and the injuries caused by each offense were the same. *See State v. Wilson*, 2023-Ohio-218, ¶ 18 (8th Dist.).

{¶ 217} Accordingly, we sustain Church's seventh assignment of error. We vacate the convictions for Counts 1 and 5 and remand this matter for a limited resentencing, at which the state shall have the right to elect which offense to pursue. *See State v. Williams*, 2010-Ohio-147, ¶ 30. The remaining convictions and sentences in the matter are not affected by this ruling. Further, the jury's guilty verdicts on Counts 1 and 5 remain the law of the case and are not subject to review on remand.

## G. Eighth Assignment of Error – Reagan Tokes Law

{¶ 218} In Church's eighth assignment of error, he challenges the application of the Reagan Tokes Law to his sentence in Cuyahoga C.P. No. CR-21-665502-A (the November 2020 shooting). Church's assignment of error is overruled pursuant to the decision in *State v. Hacker*, 2023-Ohio-2535, where the Ohio Supreme Court addressed similar arguments and found the Reagan Tokes Law to be constitutional. The *Hacker* Court determined the law does not violate the separation-of-powers doctrine, the right to a jury trial, or the right to due process. *Id.* at ¶ 41.[3]

## III. Conclusion

{¶ 219} The trial court's judgments are affirmed in part and vacated in part, and these matters are remanded to the trial court, as follows.

{¶ 220} With respect to Cuyahoga C.P. No. CR-21-665390-A, the judgment is affirmed. We remand the matter for the trial court to enter a corrected sentencing journal entry, nunc pro tunc.[4] In the corrected entry, the trial court shall do the following: (1) delete the sentence that reads, "COUNT 4, 18 MONTHS PLUS AN ADDITIONAL 54 MONTHS ON THE FIREARM SPECIFICATION TO BE SERVED PRIOR TO AND CONSECUTIVE TO THE UNDERLYING CHARGE" and (2) correct

---

[3] Church concedes that *Hacker* compels this court to overrule this assignment of error. He notes that he asserted the argument "for protection of the record in the event of reconsideration by the Ohio Supreme Court or a Federal Court."

[4] *See, e.g., State v. Ketchum*, 2021-Ohio-1583, ¶ 34 (8th Dist.) (remanding for correction of a clerical error); *State v. Harper*, 2022-Ohio-3329, ¶ 14 (8th Dist.) (same); *State v. Pugh*, 2022-Ohio-3038, ¶ 10 (8th Dist.) (same); *State v. Logan*, 2023-Ohio-1135, ¶ 69 (8th Dist.) (same), *vacated on other grounds by State v. Logan*, 2023-Ohio-3353 (8th Dist.) (en banc); *State v. Clifton*, 2022-Ohio-3814, ¶ 99 (8th Dist.) (same).

the erroneous reference to multiple "charges" in the next sentence of that journal entry; the sentence should read as follows: "UNDERLYING CHARGE TO RUN CONCURRENT TO CASE NUMBER 665502."

{¶ 221} With respect to Cuyahoga C.P. No. CR-21-665502-A, we vacate the convictions on Counts 1 and 5, since those are allied offenses subject to merger. We remand this matter for a limited resentencing, at which the state shall elect which offense to pursue. The judgment is affirmed in all other respects, and the jury's guilty verdicts remain the law of the case and are not subject to review on remand.

It is ordered that costs are divided equally between the parties.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, PRESIDING JUDGE

KATHLEEN ANN KEOUGH, A.J., and
MICHAEL JOHN RYAN, J., CONCUR